UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Atain Specialty Insurance Company, formerly known as USF Insurance Company, <br><br> Plaintiffs, <br><br> vs. <br><br> Carolina Professional Builders, LLC, a South Carolina limited liability company, and John E. McGrath, <br><br> Defendants. | Civil Action No. 2:18-cv-2352-BHH <br><br><br> **OPINION AND ORDER** |

This matter is before the Court on Plaintiff Atain Specialty Insurance Company, formerly known as USF Insurance Company's ("Atain") motion for summary judgment. (ECF No. 29.) For the reasons set forth in this Order, Atain's motion is granted.

## BACKGROUND

USF Insurance Company, now Atain, issued a Commercial General Liability insurance policy to Carolina Professional Builders, LLC ("CPB"), Policy Number RGCGL80054, effective March 27, 2009 to March 27, 2010 (the "Policy"). (ECF No. 30-1.) The Policy includes the following insuring agreement, which provides, in relevant part:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit"

1

> seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
>
>> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>>
>> (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

(ECF No. 30-1 at 13.) The Policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. . . .

(*Id.* at 27.) The Policy defines an "occurrence" as: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 26.)

The Policy includes Form No. IC IL 11 30 06 97 ("CPIL Endorsement"), which provides, in relevant part:

### CONTINUOUS AND PROGRESSIVE INJURY LIMITATION

> This endorsement modifies insurance provided under the following:
>
> All Liability coverages in All Coverage Forms
>
> A. This insurance does not apply to the following, which is added to the EXCLUSIONS:
>
>> All bodily injury," "property damage," personal injury" or "advertising injury" that first becomes actually or constructively known to any person prior to the effective date or after the expiration of this policy regardless of whether there is repeated or continued exposure

during the period of the policy or whether the injury or damage continues, progresses or deteriorates during the term of the policy.

B. If this policy extends for more than one annual period, then the following applies:

1. The most we will pay for "bodily injury," " property damage," "personal injury," and "advertising injury" that is continuous or progressively deteriorating, and that is first apparent during one of the periods of this policy, is the applicable limit of insurance available with respect to that one period.

2. The limit specified in paragraph B.1. above is the only limit that applies to all related "bodily injury," "property damage," "personal injury" or advertising injury", regardless of whether such injury or damage existed before, or continues or progressively deteriorates after, the period in which it is first apparent.

C. Within the meaning of this endorsement, injury or damage is apparent when appreciable harm occurs that is or should be known to the insured, the person, or organization harmed.

(*Id.* at 35 (punctuation and spacing errors in original).)

Defendant John E. McGrath ("McGrath") filed a lawsuit in the Charleston County Court of Common Pleas against CPB[1] and others on June 23, 2015 ("Underlying Lawsuit"). (ECF No. 30-2.) The original complaint in the Underlying Lawsuit alleged that "[McGrath], *due to recent investigations*, has determined that the Residence is extensively damaged, which damage was proximately caused by the Defendants, their agents, servants and subcontractors." (*Id.* ¶ 32 (emphasis added).) The current operative pleading in the Underlying Lawsuit is a third amended complaint, which was filed on November 8, 2017. (ECF No. 30-3.) It contains the same pertinent allegation that McGrath learned of the alleged property damage to his home "due to recent investigations." (*Id.* ¶ 40.) The Court, pursuant to Federal Rule of Evidence 201(b)(2), hereby takes judicial

---

[1] Hereinafter, McGrath and CPB will be referred to collectively as "Defendants."

notice of the pleadings, depositions, and sworn written answers to interrogatories from the Underlying Lawsuit.

McGrath was deposed in the Underlying Lawsuit. (McGrath Dep., ECF No. 30-4.) Regarding when he discovered the "property damage" on which the Underlying Lawsuit is based,[2] McGrath stated:

> A: What's confusing about this is we had this work done in -- *We noticed it like in '14.* It was Paul. And I know that I've had this redone again. *In '14, we had some work done on all of these decks. I think '14 and '15, I believe.*
>
> Q: That more recent work on the decking – I guess we could call them terraces -- is that on the front and the rear of the house?
>
> A: Yes.
>
> Q: That you had some repairs done?
>
> A: Yes. We've had repairs done on both the front and back decking and on -- let's call them the three -- second level exterior two balconies, and then we'll call it a faux balcony above the entry door were all redone by the same company.
>
> Q: What prompted that work to be done? What kind of condition were you seeing, or what was developing?
>
> A: So the genesis of the -- What kind of uncorked the genie out of a bottle, Paul -- We'll call him Paul Landscaper. Can we do that?
>
> Q: Sure.
>
> A: Because there are a couple Pauls involved. So Paul noticed that on the

---

[2] Per paragraph 47 of the third amended complaint in the Underlying Lawsuit, the faulty construction allegedly resulting in "property damage" to McGrath's residence includes: failure to make the exterior building envelope water tight; improper installation of the exterior brick cladding; improper installation of the exterior stonework; failure to construct the exterior decks in a leakproof and water tight manner; improper installation of the bluestone on the exterior decks; failure to install, or properly install, an appropriate secondary weather resistant barrier on the exterior wall sheathing; failure to install, or properly install, flashing at windows and/or doors; improper installation of windows and doors; failure to properly protect rough openings from moisture intrusion; improper installation of roof covering; failure to install the liquid applied roof deck membrane on the pool house in a leak proof manner; failure to install, or properly install, adequate sealant joints between dissimilar materials; improper construction of concreate masonry unit foundation walls; improper insulation of HVAC mechanical ductwork; and improper insulation of the attic. (ECF No. 30-3 at 9–11.)

exterior of the house was moist, and then one of our storage areas and also in the garage there was mold.

Q: Okay.

A: *So we started to chase the mold issue like at the beginning of '14.* And then I know in talking to Paul yesterday that he told me *we had work done in the summer of '14.* And he said he started with -- Paul, himself, he had hired another worker or two, thought that it could be -- We did a foundation drain. So he thought it could be too much moisture there.

Then what happened is when that didn't remediate anything, I believe he noticed that there was water actually -- It was very moist, and he asked me if he could drill through the mortar on one of the walls. And when he did that, water was shooting out like three feet this way (indicating). So Paul drilled a series of holes, and the water I think -- Paul may be the best to tell, but I think it drained for several days.

So what that led to is now we know water is in our walls coming down and through. Now we are kind of in the middle of -- Now we are in '14, the end of '14, and we are chasing where is the water coming from. You know, where is it, how high. . . .

*And I called Larry over. This is going to be mid 2014. Could be late '14 when I talked to Larry about it.* It's an interesting conversation, but Larry told me that that's terrible. Larry was very nice about it. He's been nice through this whole process. He just said that that's unacceptable. It's funny, because then he pointed out to me that the house didn't have weep holes. And he said -- He actually opened the conversation. He said, I hope you're not in a litigious mood. And I said, Why? And he said, I just noticed you have no weep holes in the house. I responded, What's a weep hole? And he said, Well, a weep hole is -- this is where water -- it allows water to escape through the brick that comes in. I said, How can water get behind the brick? And he said it can and it does and he explained it to me. I now know about weep holes.

If it were me, I would have jumped in and assisted. And I asked him to. But I just didn't get any -- I just didn't get the assistance or the response that I thought I would. And we've continued to chase -- To this day right now, I don't know where the water is still coming from. It got to the point where we did some roofing. We tried to do the flashing. We did a copper top on the roof. We've tried to plug -- All of the guys that we've had out have tried to go ahead and seal holes. But I'm told now by the experts that these gaps are too large and it's just allowing water intrusion.

*So it started really in '14, got worse in '15.* We probably went to buckets. '16 was our bucket year. So what we have is buckets now in my office. And we have photographs and video and stuff like that.

So that's where we are at. . . .

(McGrath Dep. 115:2–116:25, 117:13–118:23 (emphasis added).) With respect to

construction issues identified prior to 2014, McGrath testified:

> Q: This is Exhibit 27, and it's an invoice from Carolina Professional Builders, Bates labeled Plaintiffs McGrath 871.[3]
>
> A: Right.
>
> Q: This came from your file. It's dated July 27, 2009. Correct?
>
> A: That's correct.
>
> Q: Are you able to look back at the description on the invoice and kind of tell me what was happening at the house that prompted this work?
>
> A: Yeah. I think this is unrelated to the current issues. I do remember this well, because Larry and I got into this one.
> If you can imagine a house this size, I don't think you're going to be able to produce a single charge-back. Larry never accepted not a single charge-back that I can recall.
> So this was a matter of -- In the back, we have three doors in the rear. I don't know how you would like to identify it. Second level rear doors.
>
> Q: If we look at Exhibit 26 --
>
> . . . .
>
> Q: The top is labeled first floor, and this is labeled second floor.
>
> A: So it would be second floor off of Exhibit 26. There are three doors off the back of the grand hall. So there are three double doors.
>
> [Whereupon a discussion ensued as to the proper way to refer to the different floors of the residence.]
>
> A: Okay. First floor rear, grand hall, there is copper below it, and it was my recollection that Larry's individuals installed the seal for the door on the bottom. I forget the proper name right now.
>
> MR. KIRCHNER: Pan or threshold.
>
> A: There's a threshold. Thank you. There's a threshold. And then below the threshold there's a pan below it. When they put fthe threshold in, they used nails or screws that were like this long (indicating). What they did was they punched through the pan below. So water was entering through the pan at

---

[3] For the sake of clarity, the Court would specify that the invoice being discussed in this portion of McGrath's deposition is Invoice # 1325, the same invoice referenced *infra* at page 16–17.

that time.

Again, I consider this part of normal -- There was a few -- I don't even consider this that major. But this is one of the items that was remediated. They just replaced the pan underneath, stopped the water from coming in.

My point of contention with Larry was that this should have been a warranty item.

BY MS. DYER:
Q: Okay.

A: And he said, well -- I remember the conversation with Larry saying, well, I don't know which sub did it. And I said, well, it doesn't matter. I recall your guys doing it, and it didn't matter if your guys did it or the sub did it. We haven't had a charge-back. And we've got a multi-million dollar house. We don't have a charge-back. And you're handing me a bill. So that's this bill.

But I think this has been, to my knowledge, remediated. If it's been remediated correctly, you're going to have to -- somebody else would have to tell me that.

Q: The issue with the penetration of the pans on those rear doors, how did you come to know that there had been a problem there? Did it prompt some kind of a leak?

A: Yes.

Q: Where was the leak manifesting?

A: I don't recall the exact time or spot. But I do have recollection of -- It may have actually been -- It may have been into the second floor. And then somebody pulled up the floor, and we saw that there was damage to the joist.

*So this is '09.* So for two years you had some water going into those. And that was those joists -- I don't think they had replaced them. I think they had to brace them. But this is the work that they did.

I went ahead and at that point in time with Larry, I decided it was better to just pay this and not fight at that time.

Q: So when you're talking about the leak that you noticed where you became aware there was a concern in that area, was it on the ground floor looking up?

A: It was on the second floor. Again, I don't think this is -- I could be wrong. I don't think this is associated at all with what we've got going on now.

(*Id.* 109:10–110:6, 110:10–14, 111:9–113:19 (emphasis added).) However, when

questioned further about any connection between the 2009 repair work he described and the work itemized on the invoice being referenced by examining counsel, McGrath stated he had been confused:

> Q: The explanation in the invoice, Exhibit 27, talks about ducting the range hood through the exterior wall. And then the second item is waterproofing and dampproofing. And it says remove bluestone at front balcony, remove plywood decking, pour concrete, waterproof deck and reinstall bluestone and railings.
>     To me, that just sounds like a little bit of a different scope of work or repair than what you just described with the door pans.
>
> A: Excuse me. This is my error. You're correct. This is another -- This is two separate items unaffiliated with the back -- unaffiliated with that fix.
>
> Q: So we've talked about the rear door threshold and pans –
>
> A: So you should have another deposition -- I'm sorry, you should have another exhibit for what I was referring to.
>
> Q: We might.
>
> A: Sorry about that. My error. And I don't recall it, but this is -- I really don't recall anything about the ducting range hood through the exterior wall. That would be some sort of smoke issue or associated with something like that.
>     Reinstall railings. This is confusing. I don't recall this. Again, it's a small item. And I don't have the same -- Maybe I don't have the -- This may have gotten by me and just got paid by the office, because I would have had the same issue, because it would be a warranty issue. But apparently it got paid. I don't remember it.
>
> [Whereupon, McGrath begins describing the discovery of alleged "property damage" in 2014, which testimony is quoted *supra* at 4–5.]

(*Id.* 113:20–115:1.)

In response to CPB's interrogatories in the Underlying Lawsuit, McGrath responded to an inquiry concerning the date he first discovered the problems or defects alleged in his complaint by referring to his expert's report and documents Bates labeled McGrath 0001-0931. (ECF No. 30-5 at 2.) The investigation that formed the basis of the

expert report was conducted in May 2015, and the report was generated in July 2015. (ECF No. 32-3 at 2.) The expert report makes no reference to the alleged "property damage" being discovered between March 27, 2009 and March 27, 2010. (*See* ECF No. 32-3 & 32-4.) Defendants have not directed the Court to any document(s) among the designated Bates range (numbering almost 1,000 pages (*see* ECF Nos. 33-1–34-2)) that would show the alleged "property damage" was discovered during that time frame.

In pertinent pleadings in the Underlying Lawsuit, all of the contractors, subcontractors, and sub-subcontractors, including CPB, expressly denied that their work was defective. (*See* ECF Nos. 31-1–31-9.) Further, each such contractor, subcontractor, and sub-subcontractor expressly denied that any alleged "property damage" occurred to the McGrath's residence as a result of their defective work. (*See id.*) The salient allegations in the Underlying Lawsuit, and the contractors, subcontractors, and sub-subcontractors corresponding denials are summarized in Exhibit A to Atain's motion for summary judgment. (ECF No. 29-1.) Consequently, CPB, and any other contractors, sub-contractors, or sub-subcontractors denied having knowledge, constructive or otherwise, of "property damage" occurring at the McGrath's residence at any time.

CPB's answers to McGrath's interrogatories indicate that CPB reported the Underlying Lawsuit to Atain once it was filed. (*See* ECF No. 32-1 at 7.) There is no evidence that CPB notified Atain, between 2009 and the filing of the Underlying Lawsuit in 2015, of any incident or occurrence that might give rise to McGrath's claims against CPB.

McGrath's Rule 26 disclosures reflect that he has not identified any witness, other than the immediate parties to this lawsuit and his expert, to support the contention that

Defendants' claims should be covered under the Policy. (*See* ECF No. 32-2 at 1–2.) As indicated above, McGrath's expert first went to the residence to conduct his inspection in May 2015. Likewise, McGrath's responses to Atain's interrogatories do not identify additional witnesses that would have information as to discovery of the alleged "property damage" during the 2009 to 2010 timeframe. (*See* ECF No. 32-5 ¶¶ 2–5.)

CPB's Rule 26 disclosures do not identify any witnesses other than the immediate parties to this lawsuit that would have information pertinent to the applicability of the CPIL Endorsement or to McGrath's affirmative defenses. (*See* ECF No. 35-1 at 1–2.) Also, CPB's responses to Atain's interrogatories do not identify any additional witnesses that would have information regarding discovery of the alleged "property damage" during the Policy term. (*See* ECF No. 35-2 ¶¶ 2–3.)

Atain filed the instant declaratory judgment action on August 23, 2018 seeking relief pursuant to 28 U.S.C. § 2201 to establish the absence of coverage for the Underlying Lawsuit. (*See* ECF No. 1.) On September 30, 2019, Atain filed its motion for summary judgment, advancing arguments limited to application of the Policy's CPIL Endorsement to preclude coverage. (*See* ECF No. 29.) Defendants filed a response in opposition on October 22, 2019. (ECF No. 38.) Atain filed a reply on November 6, 2019. (ECF No. 43.) On December 18, 2019, pursuant to the parties' consent motion, the Court stayed this matter pending the outcome of mediation scheduled for February 20, 2020. (ECF No. 45.) The Court lifted the stay on February 26, 2020, after being advised by the parties that the mediation resulted in an impasse and the parties sought the Court's consideration of the motion for summary judgment prior to any potential future settlement discussions. (ECF Nos. 47 & 48.) This matter is ripe for review and the Court now issues

the following ruling.

## LEGAL STANDARD

**Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and ambiguities against the

movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Insurance Policy Interpretation**

In South Carolina, "[i]nsurance policies are subject to the general rules of contract construction," and the "cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Auto Owners Ins. Co. v. Benjamin*, 781 S.E.2d 137, 141 (S.C. Ct. App. 2015) (quoting *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012)). "Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning." *Id.* Where the terms of an insurance policy are ambiguous or conflicting, courts must construe those terms "liberally in favor of the insured and strictly against the insurer." *Id.* In other words, "where policy provisions may be reasonably interpreted in more than one way, the court must use the interpretation most favorable to the insured." *CAMICO Mut. Ins. Co. v. Jackson CPA Firm*, No. 2:15-cv-1823-PMD, 2016 WL 7403959, at *8 (D.S.C. Dec. 22, 2016) (citing *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 136 (S.C. Ct. App. 2000)). "'[T]he Court will look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden

trap or pitfall, or if the fine print takes away that which has been given by the large print.'"

*State Farm Fire & Cas. Co. v. Morningstar Consultants, Inc.*, C.A. No.6:16-cv-01685-MGL, 2017 WL 2265919, at *2 (D.S.C. May 24, 2017) (quoting *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399, 407 (2014)) (alteration in original). However, "[this] doctrine is not a rule granting substantive rights to an insured when there is no doubt as to the meaning of policy language," *id.* (quoting *Bell*, 757 S.E.2d at 407), and "the insurer's duty under a policy of insurance . . . cannot be enlarged by judicial construction." *Id.* (citing *S.C. Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. 1990)). "[C]lauses of inclusion should be broadly construed in favor of coverage, and when there are doubts about the existence or extent of coverage, the language of the policy is to be 'understood in its most inclusive sense.'" *Cook v. State Farm Auto. Ins. Co.*, 656 S.E.2d 784, 786 (S.C. Ct. App. 2008) (quoting *Buddin v. Nationwide Mut. Ins. Co.*, 157 S.E.2d 633, 635 (1967)). "Courts should not, however, 'torture the meaning of policy language in order to extend' or defeat coverage that was 'never intended by the parties.'" *Cook*, 656 S.E.2d at 786-87 (quoting *Torrington Co. v. Aetna Cas. & Sur. Co.*, 216 S.E.2d 547, 550 (S.C. 1975)). "The court's duty is limited to the interpretation of the contract made by the parties themselves regardless of its wisdom or folly, apparent unreasonableness, or failure of the parties to guard their interests carefully." *B.L.G. Enterprises, Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999) (quotation marks, alteration, and citation omitted).

**Duty to Defend**

Under South Carolina law, the duty to defend is broader than the duty to indemnify. *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011). "If the underlying complaint creates a *possibility* of coverage under an insurance policy, the

insurer is obligated to defend." *City of Hartsville*, 677 S.E.2d at 578 (citing *Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co*, 265 S.E.2d 38 (S.C. 1980)) (emphasis added). This District has previously explained, "[T]he duty to defend is triggered where the underlying complaint includes *any allegation* that raises the possibility of coverage." *Auto-Owners Ins. Co. v. Newsome*, No. 4:12-CV-00447-RBH, 2013 WL 3148334, at *4 (D.S.C. June 19, 2013) (emphasis added). An insurer's duty to defend is generally governed by the allegations in the underlying complaint; however, the possibility of coverage may also be determined by facts outside of the complaint that are known by the insurer. *City of Hartsville*, 677 S.E.2d 574, 578 (S.C. 2009) (citing *USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 798 (S.C. 2008)); *see also BP Oil Co. v. Federated Mut. Ins. Co.*, 496 S.E.2d 35, 39 (S.C. Ct. App. 1998) ("Although the determination of an insurer's duty to defend is based upon the allegations in a complaint . . . in some jurisdictions, the duty to defend will be measured by facts outside of the complaint that are known by the insurer."). Because the duty to defend is broader than the duty to indemnify, if there is no duty to defend, then as a matter of law, an insurer also has no duty to indemnify its insured. *See State Farm Fire & Cas. Co. v. Baskett*, No. 1:16-CV-02547-JMC, 2017 WL 2629497, at *3 (D.S.C. June 16, 2017) ("If an insured has no duty to defend, it will know that it has no duty to indemnify." (citation omitted)).

## DISCUSSION

Atain's complaint includes multiple counts alleging an absence of coverage for the "property damage" at issue in the Underlying Lawsuit: Count I – Continuous or Progressive Injury Limitation; Count II – No Occurrence During the Policy Period; Count III – No Property Damage; Count IV – No Coverage Business Risk Exclusions; Count V

– No Coverage Fungi or Bacteria Exclusion; Count VI – Punitive Damages Exclusion; and, Count VII – Property Damage Limited to Atain's Time on the Risk. (Compl. ¶¶ 24– 48.) However, the theory of relief that is addressed in the summary judgment briefing is the CPIL Endorsement (Count I). (*See* ECF Nos. 29, 38, 43.) If the CPIL Endorsement applies to exclude coverage because the "property damage" at issue was only first known after the Policy expired in 2010, it is dispositive.

Atain asserts the CPIL Endorsement excludes coverage because the undisputed record establishes that neither CPB, nor McGrath, nor "any person" were aware prior to expiration of the Policy of any "property damage" for which coverage is now sought. (ECF No. 29 at 11–16.) Atain points to the language of McGrath's pleadings in the Underlying Lawsuit, in which he specifically alleges that the damage to his residence became known to him shortly before the suit was filed in June 2015. (*See* ECF No. 30-2 ¶ 32 ("due to recent investigations"); ECF No. 30-3 ¶ 40 (same).) Moreover, Atain notes that when asked for the names of witnesses who would support Defendants' opposition to Atain's claim for declaratory relief, Defendants did not identify any witnesses who would have knowledge of "property damage" to McGrath's residence during the Policy period. (*See* ECF No. 32-2 at 1–2 (McGrath's Rule 26 disclosures—identifying as witnesses only the parties and McGrath's expert); ECF No. 32-5 ¶¶ 2–3 (McGrath's answer to Atain's interrogatories—identifying no additional witnesses); ECF No. 35-1 at 1–2 (CPB's Rule 26 disclosures—identifying as witnesses only the parties); ECF No. 35-2 ¶¶ 2–3 (CPB's responses to Atain's interrogatories—identifying no additional witnesses).) Further, Atain highlights McGrath's deposition testimony, in which McGrath states that he called CPB's representative to discuss the alleged "property damage" in 2014 after discovering mold

related to accumulated water in the walls of the residence. (*see* McGrath Dep. 116:4–25, 117:13–20.) Thus, by McGrath's testimony, his and CPB's investigation of these issues happened years after the Policy expired. Finally, Attain contends that McGrath's affirmative defenses of laches, unclean hands, waiver, estoppel, and the purported insufficiency of Atain's reservation of rights, do not operate to avoid application of the CPIL Endorsement. (*See* ECF No. 29 at 17–18.)

Defendants respond by claiming that the following material facts are in dispute and prevent the entry of summary judgment:

1. Mr. Cantley[4] and CPB first became aware of property damage to the residence in July 2009.
2. Property damage at the residence first became known to Mr. Cantley and CPB during the Atain policy period.
3. The property damage first known to Mr. Cantley and CPB in July 2009 was not properly repaired and continued.
4. Mr. McGrath did not testify that the issues from July 2009 were not part of the basis of the claims asserted in the underlying lawsuit.
5. The property damage that the underlying lawsuit is based on includes the damage first known to Mr. Cantley and CPB in July 2009 that was discovered to have been improperly repaired and continue by RTM Engineering[5] in 2015.

(ECF No. 38 at 3 (internal footnotes excluded).) In other words, Defendants argue that a genuine issue of material fact exists as to whether the "property damage" alleged in the underlying complaint was first known by CPB during the Policy period, thereby eliminating the applicability of the CPIL Endorsement. (*See id.* at 4–7.) In support of this argument, Defendants submit: (1) Mr. Cantley's affidavit – in which he states that CPB was notified of water intrusion and property damage to the front balcony of McGrath's residence in July 2009 and performed remedial repair work in an effort to address the water intrusion

---

[4] Mr. Cantley is the owner of CPB, which was the general contractor for McGrath's residence.
[5] Russell T. Mease, of RTM Engineering, LLC is McGrath's expert, and the engineer who conducted an inspection of McGrath's residence in May 2015.

and damage (ECF No. 38-1 ¶¶ 6, 9); (2) CPB's Invoice # 1325 – dated July 27, 2009, itemizing work conducted at the McGrath residence including "Waterproofing & Dampproofing: Remove bluestone at front balcony, remove plywood decking, pour concrete, waterproof deck, and re-install bluestone and railings" (ECF No. 38-2); (3) Excerpts from Mr. Cantley's deposition, as CPB's Federal Rule of Civil Procedure 30(b)(6) representative, in the Underlying Lawsuit – where he confirms that the work itemized on Invoice # 1325 was done to correct water intrusion (ECF No. 38-3 at 2) and confirms that "[w]hatever was done . . . [he] thought [he] had resolved the problem" (ECF No. 38-4 at 2). From these pieces of evidence, Defendants argue that McGrath's expert's investigation "discovered that the July 2009 attempted repairs by CPB were improper and failed to stop the continuing damage that was first known to CPB in July 2009." (ECF No. 38 at 5.) Moreover, Defendants contend that McGrath's deposition testimony about the July 2009 repairs—on which Atain relies to differentiate between the "property damage" at issue in the Underlying Lawsuit and earlier, unrelated repairs at the residence—does not show that the "property damage" was not discovered during the Policy period because McGrath "was mistakenly referring to a door threshold on the rear of the residence, which was not the subject of the July 2009 work."[6] (ECF No. 38 at 7.) Defendants argue that the Underlying Lawsuit asserts claims related to "property damage" first known to CPB during the Policy period because the Underlying Lawsuit seeks relief for damage caused by water intrusion due to defective conditions of the exterior decks and balconies, and

---

[6] Part of Defendants' contention is that Atain selectively cited certain portions of McGrath's deposition to argue that the July 2009 work was unrelated to the issues in the Underlying Lawsuit. (*See* ECF No. 38 at 7, n.21.) However, the Court has extensively quoted McGrath's deposition in the "Background" section of this Order (*supra* at 4–7) so the reader can appreciate the full context of McGrath's testimony, see where and how McGrath was admittedly mistaken, and understand how his testimony illuminates the timeline regarding discovery of alleged construction-related defects that led to him filing the Underlying Lawsuit.

because the 2009 repairs were for the purpose of remediating water intrusion and damage to the front balcony. (*See id.* at 7–9.) Finally, Defendants assert that Atain has a duty to defend CPB because the underlying complaint contains allegations against its insured for "property damage" that first became known to CPB during the Policy period. (*Id.* at 10–11.)

The Court agrees with Atain that it has no duty to defend and no corresponding duty to indemnify, and hereby grants summary judgment for the following reasons. First, the plain language of the CPIL Endorsement bars coverage for "property damage" that is first discovered after the expiration of the policy. The language is unambiguous and subject to only one interpretation: "This insurance does not apply to the following, which is added to the EXCLUSIONS: All . . . 'property damage' . . . that first becomes actually or constructively known to any person . . . after the expiration of this policy regardless of whether there is repeated or continued exposure during the period of the policy . . . ." (ECF No. 30-1 at 35.) Second, the parties were free to contract for such an exclusion modifying the trigger of coverage under the insuring agreement, and the Court's interpretive task is limited to discerning the agreement crafted by the parties "regardless of its wisdom or folly, apparent unreasonableness, or failure of the parties to guard their interests carefully." *See B.L.G. Enterprises*, 514 S.E.2d at 330. There is no indication that the CPIL Endorsement is in contravention of public policy or a statutory prohibition, nor have Defendants' argued as much. Third, despite Defendants' protestations, the evidence they have produced does not create a genuine dispute of material fact as to whether the "property damage" claimed in the Underlying Lawsuit was discovered during the Policy term. While there is certainly a dispute over a material fact—to wit, whether the "property

damage" at issue was first discovered in 2009, as opposed to 2014—that dispute is not "genuine" in that, even construing all inferences and ambiguities in favor of Defendants, the evidence offered is insufficient to cause a reasonable jury to return a verdict in Defendants' favor. *See Anderson*, 477 U.S. at 248.

Defendants jointly assert that CPB was aware of "property damage" due to improper construction in July 2009, despite: (1) McGrath's deposition testimony that the "genesis" of the alleged "property damage" about which he brought suit—"what uncorked the genie out of the bottle"—was when he and others "started to chase the mold issue like at the beginning of '14" (*see* McGrath Dep. 115:2–118:23); and (2) the allegations in the underlying complaint—filed in June 2015—which state that McGrath, "*due to recent investigations*, has determined that the Residence is extensively damaged, which damage was proximately caused by [CPB and its subcontractors]" (*see* ECF No. 30-2 ¶ 32 (emphasis added)). It is clear from McGrath's testimony that he confused repair work performed on a door threshold at the rear of the residence with unrelated repair work performed by CPB in July 2009 for the purpose of remedying water intrusion to a front balcony. (*See* McGrath Dep. 114:5–115:1.) Nevertheless, even adopting the assertions in Mr. Cantley's affidavit as true—that "[t]he water intrusion damage below the front balcony that was identified in the RTM Engineering report is located in the same area that [CPB] previously repaired in July 2009" (ECF No. 38-1 ¶ 9)—the mere fact that CPB made repairs to the same *kind* of damage five years prior to the 2014 emergence of the current issues does not mean that it is the *same* "property damage" and was therefore known to CPB during the Policy period.

Indeed, if the 2009 repair work addressed the same "property damage" that

McGrath now contends forms the basis of the Underlying Lawsuit in 2015, then CPB's failure to timely report the "property damage" to Atain in 2009 breached the Policy's notice provision and substantially prejudiced Atain. Generally, "breach of an insurance policy's notice clause automatically relieves the insurer of its obligations under the contract, including the payment of proceeds due, and the duty to defend and to indemnify the insured." *Wright v. UNUM Life Ins. Co.*, No. 2:99-2394-23, 2001 WL 34907077, at *2 (D.S.C. Aug. 31, 2001) (citing *Lee v. Metropolitan Life Ins. Co.*, 186 S.E.2d 376, 381 (S.C. 1936)). As a condition to coverage, the Policy imposes an obligation on an insured to report to the insurer any "occurrence" that could give rise to a claim as follows:

**2. Duties In The Event Of An Occurrence, Offense, Claim Or Suit**

　　a. You must see to it that we are notified as soon as practicable of an "occurrence" or offense which *may* result in a claim. To the extent possible, notice should include:

　　　　(1) How, when and where the "occurrence" or offense took place;

　　　　(2) The names and addresses of any injured persons and witnesses; and

　　　　(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

(ECF No. 30-1 at 22–23 (emphasis added).) South Carolina law recognizes that damage to property other than defective workmanship itself, caused by such defective workmanship, constitutes an "occurrence" of "property damage". *See Crossman Communities of N.C. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 593 (S.C. 2011) ("We emphasize the difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" (quotation

marks and citations omitted)). Therefore, under the explicit terms of the Policy, CPB had a duty to give Atain notice of any "property damage"—i.e., "occurrence"—about which it had knowledge, and which "may result in a claim," "as soon as practicable."

CPB cannot have it both ways. It cannot, on the one hand, argue that it was called out to McGrath's residence in 2009 to repair "property damage," and on the other hand argue that it had no duty to notify Atain of an "occurrence" which "may result in a claim." Either it was unaware in 2009 of the "property damage" for which McGrath *now* seeks recovery in the Underlying Lawsuit, or it breached its obligation to notify Atain of an "occurrence" of "property damage" that it knew about in 2009. It would be patently unreasonable for CPB to have knowledge of "property damage" in the form of water intrusion into McGrath's home, yet fail to provide notice of such "property damage" to Atain for six years. Moreover, a six-year delay in notifying the insurer of damage in the form of water intrusion would allow the damage to fester and dramatically worsen over time. This is evidenced by the discrepancy between the cost of repairs that Mr. Cantley believed "resolved the problem" in 2009—invoiced at $3,042.00 (*see* ECF No. 38-2)— and the damages for comprehensive repairs now claimed by McGrath in the Underlying Lawsuit—itemized at $3,922,593.20 (*see* ECF No. 34-11 at 1). If it is true that CPB knew of the "property damage" in 2009 and failed to notify Atain until 2015, that delay has substantially prejudiced Atain. Upon receipt of timely notice, Atain would have had the opportunity to investigate the circumstances of the alleged "property damage" and determine what processes could be employed to minimize CPB's risk. *See CAMICO Mut. Ins. Co. v. Jackson CPA Firm*, No. 2:15-CV-1823-PMD, 2016 WL 7403959, at *12 (D.S.C. Dec. 22, 2016) (finding failure to give notice of potential claim resulted in substantial

prejudice to insurer by precluding it from early investigation of facts and ability to mitigate insured's exposure); *Factory Mut. Liab. Ins. Co. of Am. v. Kennedy*, 182 S.E.2d 727, 729 (1971) (holding, in an action affecting rights of innocent third parties under automobile liability insurance policy, noncompliance by insured with policy provisions as to notice and forwarding suit papers will not bar recovery, unless insurer shows that failure to give such notice has resulted in substantial prejudice to its rights); *Washington v. National Service Fire Ins. Co.*, 168 S.E.2d 90, 93 (S.C. 1969) ("The purpose of these policy [notice] requirements is to enable the insurer to inform itself promptly concerning the accident, to investigate the circumstances, and prepare a timely defense, if necessary on behalf of the insured." (quotation marks and citation omitted)). Instead, the "property damage" for which Defendants now seek coverage—assuming it is the same as "property damage" putatively known by CPB in 2009—unquestionably requires repairs of far greater cost than would have been required in 2009, and Atain's opportunity to mitigate the exposure of its insured has been foreclosed. Whether CPB was unaware in 2009 of the "property damage" alleged in the Underlying Lawsuit—in which case the CPIL Endorsement applies to preclude coverage—or whether it had knowledge of such "property damage" and failed to give Atain timely notice of an "occurrence"—in which case CPB breached its contractual notice obligation—either way, Atain is entitled to summary judgment and a declaration that it has no coverage obligation under the Policy for the Underlying Lawsuit.

Similarly, McGrath cannot have it both ways. South Carolina imposes a three-year statute of limitations for construction defect claims.[7] McGrath cannot, on the one hand,

---

[7] *See* S.C. Code § 5-3-530(1) & (5) (providing a three-year statute of limitations for "an action upon a contract, obligation, or liability, express or implied" and "an action for assault, battery, or any injury to the person or rights of another, not arising on contract and not enumerated by law").

assert that he was unaware of "property damage" occurring in 2009—thereby avoiding application of the statute of limitations to bar the Underlying Lawsuit—and on the other hand rely upon Invoice # 1325 from 2009 to demonstrate that the "property damage" at issue in the Underlying Lawsuit was discovered during the Policy period—thereby avoiding application of the CPIL Endorsement to prevent the entry of summary judgment in the instant case. If Invoice # 1325 relates to damage that is part of McGrath's present claims in the Underlying Lawsuit, then McGrath through the exercise of reasonable diligence would have been on notice of "property damage" caused by construction defects in 2009, not 2014, rendering the Underlying Lawsuit untimely. *See Allwin v. Russ Cooper Assocs., Inc.*, 825 S.E.2d 707, 713 (S.C. Ct. App. 2019), *reh'g denied* (Apr. 19, 2019), *cert. denied* (Sept. 18, 2019) (affirming application of three-year statute of limitations to bar construction defect claim); *see also Epstein v. Brown*, 610 S.E.2d 816, 818 (S.C. 2005) ("The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party **might** exist." (emphasis in original)), *overruled on other grounds by Stokes-Craven Holding Corp. v. Robinson*, 787 S.E.2d 485 (S.C. 2016). To put it succinctly, if the 2009 "property damage" is the same "property damage" alleged in the Underlying Lawsuit then the statute of limitations bars McGrath's claims; if it is not the same "property damage" then the Policy's CPIL Endorsement precludes coverage. In either case, Atain is entitled to summary judgment and a declaration that it has no coverage obligation.

## <u>CONCLUSION</u>

After careful consideration of the parties' briefs, the associated record, and the applicable law, the Court hereby GRANTS Atain's motion for summary judgment (ECF No. 29). The Court declares that Atain has no obligation to defend or indemnify CPB for the Underlying Lawsuit. There being no further issues requiring resolution, this action is dismissed.

**IT IS SO ORDERED.**

<u>/s/ Bruce Howe Hendricks</u>
United States District Judge

October 2, 2020
Charleston, South Carolina